1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHURCH OF THE GARDENS et al.,

   Plaintiff,

v.

QUALITY LOAN SERVICES

CORPORATION et al.,

   Defendant.

Case No. 3:23-cv-06193-TMC

ORDER GRANTING DEUTSCHE BANK'S MOTION TO EXCLUDE EXPERT WITNESSES

## I.  INTRODUCTION

This case arises from Plaintiff Alvin White's default on five mortgage loans, secured by five separate properties in Fife, Washington. Before the Court is Deutsche Bank's motion to exclude the testimony of Plaintiffs' two expert witnesses, Dr. James M. Kelley and William Paatalo. *See* Dkt. 67 at 8–9; Dkt. 91; Dkt. 96. For the following reasons, the motion is GRANTED.

## II.  BACKGROUND

In February 2006, White purchased five properties—Lot 11, Lot 16, Lot 7, Lot 10, and Lot 12—using funds borrowed from Long Beach Mortgage Company. White executed five promissory notes and deeds of trust to secure the loans. *See* Dkts. 70-1, 70-8, 70-14, 70-19, 70-

24 (promissory notes); Dkts. 70-2, 70-9, 70-15, 70-20, 70-25 (deeds of trust). By May 1, 2018, White had defaulted on all the loans. *See* Dkt. 70 ¶¶ 12, 21, 30, 36, 42. On January 5, 2024, QLS, as successor trustee, sold Lots 11 and 16 at a public auction to Long Beach Mortgage Loan Trust 2006-4, Asset-Backed Certificates, Series 2006-4 ("2006-4 Trust") and Long Beach Mortgage Loan Trust 2006-5 ("2006-5 Trust") (collectively "the Trusts"). Dkt. 70-7 at 3; Dkt. 70-13 at 3.

A.  **Procedural History**

Plaintiffs White and Church of the Gardens ("COTG") filed suit in Pierce County Superior Court on December 13, 2023 against Defendants Quality Loan Services Corporation ("QLS"), MTC Financial Inc. (doing business as "Trustee Corps"), Deutsche Bank National Trust Company, Long Beach Mortgage Loan Trust 2006-4, Long Beach Mortgage Loan Trust 2006-5, and the State of Washington. Dkt. 1-2. Deutsche Bank removed the case to this Court on December 28, 2023. Dkt. 1. On January 8, 2024, Plaintiffs amended their complaint. Dkt. 8.

Plaintiffs' amended complaint alleges that the past or potential future nonjudicial sale of White's properties violates "the organic law of this Nation and the State of Washington." Dkt. 8 ¶¶ 1.3, 4.18. The core allegation is that the Trusts do not possess the original promissory notes because they were lost or destroyed within a year the notes were signed by White. *Id.* ¶ 3.28. As a result, Plaintiffs allege that Defendants have no authority to enforce the notes against White or sell any of the properties securing the notes. *Id.* ¶ 3.28.

Specifically, Plaintiffs assert that (1) QLS's sale of Lot 11 and Lot 16 under the Washington Deed of Trust Act ("DTA") violates the due process clause, equal protection clause, and takings clause of the U.S. Constitution; (2) the sale violates Article 1, section 10, Article IV, section 6, and Article V, section 6 of the Washington Constitution; (3) the sale is a breach of contract and violates the DTA and CPA; and (4) they are entitled to a declaration that the 2006 version of RCW 61.24.130 is the governing law and a declaration as to the meaning of the

ORDER GRANTING DEUTSCHE BANK'S MOTION TO EXCLUDE EXPERT WITNESSES - 2

current version of the statute. *Id.* ¶¶ 4.7, 3.99(H), 3.99(I), 3.98, 4.6, 4.8, 4.11–4.18, 4.1, 4.2. Plaintiffs also seek to restrain any future sale of the remaining properties under the DTA. *Id.* ¶ 3.32.

The parties filed cross-motions for summary judgment. Dkt. 67; Dkt. 76. In each motion, the respective party appeared to challenge the reliability of the other's expert testimony. *See, e.g.*, Dkt. 67 at 9 ("The opinions of two purported experts the Trusts anticipate that Plaintiffs will seek to admit in the present action, James Kelley, PhD and William Paatalo, do not qualify as experts."); Dkt. 76 at 20 ("It is Plaintiff's position that forensic document examination, particularly as practiced by handwriting experts trained by graphologists like McFarland, is a field plagued by subjectivity, inconsistency, and methodological unreliability."). But neither party addressed the applicable legal standard for expert testimony under Federal Rule of Evidence 702. *See id.* The Court therefore ordered the parties to provide supplemental briefing on that standard. Dkt. 91.

Deutsche Bank filed a supplemental brief addressing FRE 702 and confirming that it sought to exclude Dr. Kelley and Paatalo. Dkt. 96. Plaintiffs objected to the Court's authority to order supplemental briefing, Dkt. 92 at 2, and disavowed any intent to challenge McFarland as an expert. *Id.* at 3 ("Plaintiffs . . . dispute the first premise, i.e. that Plaintiffs have attempted to exclude the money changers' experts, as being factually inaccurate. . . . Plaintiffs have not moved to exclude Defendants' expert; rather Plaintiffs rely on Defendants' expert witness graphology-trained handwriting expert, McFarland, to support their theory of the case."). Consistent with that position, Plaintiffs used their supplemental brief only to defend the expertise of Dr. Kelley and Paatalo. *See* Dkt. 98. Plaintiffs also provided an additional declaration from Dr. Kelley with their supplemental brief. Dkt. 100. Based on Plaintiffs' concession that they do

ORDER GRANTING DEUTSCHE BANK'S MOTION TO EXCLUDE EXPERT WITNESSES - 3

not challenge McFarland's testimony, in this Order the Court considers only Deutsche Bank's challenge to the expert testimony of Dr. Kelley and Paatalo.

**B.     Dr. Kelley's Testimony**

Dr. Kelley holds a Ph.D. in electrical and computer engineering from the University of California, Santa Barbara. Dkt. 79 ¶ 2; Dkt. 79-1 at 2. Dr. Kelley testified that he is a "forensic engineer" who "uses scientific instrumentation, digital microscopy, spectral color analysis, and other forensic image processing tools to determine how a document was physically created[.]" Dkt. 79 ¶ 3.

Dr. Kelley inspected the five promissory notes, deeds of trust, and riders held at the Trusts' counsel's office. *Id.* ¶ 4. Dr. Kelley testified that he scanned all five promissory notes, deeds of trust, and riders with an Epson V-550 photo scanner to determine (1) the presence or absence of satellite ink droplets and (2) the presence or absence of CMYK color separation. *Id.* ¶ 5. In his declaration, Dr. Kelley explained that the presence of satellite ink droplets is significant because it demonstrates whether the signatures on the documents were made by hand. *Id.* He added that the presence of CMYK color separation helps him determine whether a document had been created using two different ink jet printers. *Id.* Dr. Kelley stated that his "opinion is based on scientifically valid principles and methods consistent with the Scientific Working Group on Standards (SWGDOC)[.]" *Id.* ¶ 10.

Dr. Kelley submitted a summary of his findings and an analysis of satellite ink droplets of White's signatures and the endorsement signatures of Jess Almanza (Vice President of Long Beach Mortgage Company) and Kimberly Smith (Assistant Vice President of Long Beach Mortgage Company) on all five promissory notes. Dkt. 79-2; Dkt. 79-3. The summary identified the following tools and methods used to examine the documents: Epson V550 High-Resolution Scanner (up to 9600 PPI), Digital Microscopy, CMYK Color Separation Analysis, Spectral and

Ink Dispersion Examination, Signature Stroke Inspection and Indentation Mapping, and Overlay Analysis for Layering Artifacts. Dkt. 79-2 at 2.

After examining the notes, Dr. Kelley made the following findings (1) no indentation evidence that is typically left by a ballpoint pen or manual writing instrument; (2) numerous satellite ink droplets that are observable on all five signatures and endorsements; (3) CMYK color consistency between each signature and the body text; (4) in at least two cases, multiple endorsements that appear in precise alignment; and (5) evidence that suggests that at least two different ink jets printers were used. *Id.* at 2–3; *see* Dkt. 79-3 at 3–18.

Based on these findings, Dr. Kelley opined: "[n]one of the five ARNs contains a wet-ink signature produced by a pen;" "[e]ach document contains a digitally printed reproduction of a signature using inkjet technology;" "[t]hese reproductions are likely generated from archived scans of the original documents, which were destroyed as part of Industry wide policy;" and "[t]he presence of satellite droplets, absence of pressure indentation, and CMYK consistency confirm inkjet printing." Dkt. 79-2 at 2–3. He also opined that the "forensic hallmarks of reproduction I observed—combined with the historical context of industry practices—reinforce the conclusions that the documents presented in this case are not original negotiable instruments, and were made by ink jet printers using digital copies of the original wet-ink documents." Dkt. 79 ¶ 9.

Along with his summary and analyses, Dr. Kelley attached a declaration by Michael N. Wakshull that was prepared for a "civil case the County of King, State of Washington" on September 2, 2021. Dkt. 79-5 at 2. In that declaration, Wakshull stated that he was the Vice President of the Scientific Association of Forensic Examiners and concluded that his "analysis of Dr. Kelley's report and subsequent discussion with him about the methodology used to

determine the results stated in his report are that he did follow generally accepted practices for forensic document examination." *Id.* at 3.

In his supplemental declaration, Dr. Kelley testified that he understood "under the *Daubert* standard, the admissibility of expert testimony in federal court depends on whether the theories and techniques relied upon are scientifically valid and properly applied." Dkt. 100 ¶ 3. Dr. Kelley asserted that the methods and techniques he employed in his analysis of the signatures and endorsements are "well-established and regularly practiced by agencies of the United States government," and that he applies and relies on SWGDOC standards, which are "followed by both private and government forensic laboratories across the United States." *Id.* ¶¶ 4, 11.

Dr. Kelley attached to his supplemental declaration "a digital research summary prepared by ChatGPT AI technology on the History and current use of the HSV color analysis by government agencies and laboratories to further illustrate the background of the techniques I apply," and "a brief Summary of my Findings regarding the HSV (Hue-Saturation-Value) color space, which further supports my conclusion that the promissory notes presented to me were not signed by Plaintiff White, but were in fact created by inkjet printer and are not original or authentic documents." *Id.* ¶¶ 21, 22; *see also* Dkt. 100-4, Dkt. 100-3.

**C.    Paatalo's Testimony**

William Paatalo is an "Oregon licensed private investigator" who has "worked exclusively over the last 15 years and [] spent more than 15,000 hours conducting investigatory research and interviews related to mortgage securitization and chain of title analyses." Dkt. 81 ¶¶ 1, 3; Dkt. 81-1 at 2. Paatalo submitted an affidavit which contained his opinion on the authenticity of the promissory notes held by the Trusts. *See generally* Dkt. 81.

Paatalo provided the following opinions: (1) "The alleged endorsement by Jess Almanza is likely forged and unauthentic;" (2) "The assignments of deed of trust were executed by

unauthorized individuals;" (3) "No certified custodial history exists demonstrating continuous control of the original note;" (4) "The chain of title omits required parties identified in governing securitization documents;" (5) "No lawful authority existed to execute the assignments as attorney-in-fact;" (6) "There is no reliable evidence that the Trust lawfully received or held any of the White loans;" (7) "Industry-Wide Recognition of Deficient Practices and Legal Violations by Major Servicers and Trustees;" (8) "Deutsche Bank National Trust Company Released All Claims to Cure or Enforce Defective Mortgage Documents Under 2016 FDIC Settlement." *Id.* at 4, 7–12, 14.

Paatalo testified that his opinions were based on reviewing:

- Endorsed copies of promissory notes associated with the subject loans;
- Recorded assignments of deeds of trust;
- Sworn deposition testimony and declarations produced in discovery;
- Regulatory filings and trust documents from the SEC EDGAR database;
- Sworn declarations and statements from relevant witnesses and corporate agents;
- My personal investigative case file and discovery from a related Oregon matter (Lincoln County Case No. 18CV44633); and
- Publicly filed reports and government records (including the WAMU Bankruptcy Examiner's Final Report and Florida Bankers Association Letter).

Dkt. 81 ¶ 6.

For example, Paatalo relied on "testimony in numerous court proceedings which support the conclusion that endorsements are commonly affixed at the time litigation arises" and his "15 years of experience investigating mortgage securitization and document fraud cases" during which he "reviewed hundreds of note endorsements." *Id.* ¶¶ 8–9. Paatalo also reviewed the 2016 Global Settlement Agreement entered into on August 19, 2016, between Deutsche Bank National Trust Company ("DBNTC"), the Federal Deposit Insurance Corporation ("FDIC") as receiver for Washington Mutual Bank ("WMB"), and JPMorgan Chase Bank, N.A. ("JPMC") which he concluded "resolved all claims related to WMB-originated loans allegedly transferred into

ORDER GRANTING DEUTSCHE BANK'S MOTION TO EXCLUDE EXPERT WITNESSES - 7

numerous securitized trusts, including the Long Beach Mortgage Loan Trusts 2006-4 and 2006-5." *Id.* ¶ 27. Additionally, Paatalo opined that his review of the "Consent Judgment against [JPMC] . . . confirms nearly identical findings and violations involving improper transfers, defective documentation, and failures in servicing standards" which "collectively support the conclusion that assignments and endorsements relied upon by Defendants in the present matter are not isolated anomalies, but part of a well-documented pattern of unlawful foreclosure practices." *Id.* ¶ 21.

### III.    DISCUSSION

**A.    Federal Rule of Evidence 702 and *Daubert***

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The "Rule provides that, before admitting expert testimony, the district court must perform a gatekeeping role to ensure that the proffered testimony is both relevant and reliable." *Engilis v. Monsanto Co.*, No. 23-4201, --- F.4th -----, 2025 WL 2315898, at *3 (9th Cir. Aug. 12, 2025) (citation modified). The Ninth Circuit recently confirmed that the "proponent of expert testimony must always establish the admissibility criteria of Rule 702 by a preponderance of the evidence and that there is no presumption in favor of admission." *Id.* at *6. "Generally, an inquiry under Rule 702 examines the expert's testimony as a whole." *United States v. W. R. Grace*, 504 F.3d 745, 762 (9th Cir. 2007).

Before a witness may come "before the jury cloaked with the mantle of an expert," the Ninth Circuit has cautioned that "care must be taken to assure that a proffered witness truly qualifies as an expert, and that such testimony meets the requirements of Rule 702." *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir.), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001). Thus, as a threshold matter, the court must determine whether a proffered witness is "qualified as an expert by knowledge, skill, experience, training, or

education." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (quoting Fed. R. Evid. 702). This "standard is liberal" and an expert "need only exceed the common knowledge of the average layman." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (citation modified). "[W]hether an expert witness has sufficient qualifications to testify is a matter within the district court's discretion." *United States v. Garcia*, 7 F.3d 885, 889 (9th Cir. 1993).

Expert testimony is relevant if it "will help the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc. ("Daubert I")*, 509 U.S. 579, 591 (1993) (citing Fed. R. Evid. 702(a)); *see also Daubert v. Merrell Dow Pharmaceuticals ("Daubert II")*, 43 F.3d 1311, 1315 (9th Cir. 1995) (relevant evidence is that which "logically advances a material aspect of the proposing party's case"), *cert. denied*, 516 U.S. 869 (1995).

Expert testimony is reliable if it is "based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). In *Daubert*, the Supreme Court set out several factors that courts consider in determining reliability:

> (1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether the technique is generally accepted.

*Neal-Lomax*, 574 F. Supp. 2d at 1201 (citing *Daubert I,* 509 U.S. at 593–94). But these factors do not constitute a "definitive checklist or test," *see Daubert I*, 509 U.S. at 593, and "[i]n other cases, the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). Nor do the *Daubert* factors "necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Id.* at 151. Rather, "[t]he inquiry under Rule 702 is a 'flexible' one, and the district

ORDER GRANTING DEUTSCHE BANK'S MOTION TO EXCLUDE EXPERT WITNESSES - 9

court has 'the discretionary authority . . . to determine reliability in light of the particular facts and circumstances of the particular case.'" *Youngevity Int'l v. Smith*, No. 16-CV-704-BTM-JLB, 2019 WL 2918161, at *12 (S.D. Cal. July 5, 2019) (quoting *Kumho Tire*, 526 U.S. at 158); *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("[A] trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." (citation modified)).

**B.    Dr. Kelley's testimony must be excluded.**

Deutsche Bank asks the Court to exclude Dr. Kelley's testimony "that the five promissory notes currently in the Trusts' counsel's possession are not the wet ink original notes signed by Mr. White" because he "is not qualified to provide a forensic document examination opinion." Dkt. 96 at 3. Deutsche Bank argues that Dr. Kelley "lacks extensive education, training, or experience in handwriting analysis[,]" and admitted during a deposition in a similar case that he does not have a degree in document examination and described himself as "more of a pure science engineering person." *Id.* at 4 (citing Dkt. 85 at 7). Deutsche Bank also points out that Dr. Kelley confirmed that he has been disqualified as an expert in forensic document examination and precluded from testifying in over twenty cases. *Id.* (citing Dkt. 85 at 8).

Deutsche Bank cites *Malin v. JP Morgan Chase Bank, N.A.*, No. 3:11-CV-554, 2013 WL 12123512, at *1 (E.D. Tenn. July 8, 2013), as an example where Dr. Kelley was excluded from serving as a document examination expert. *Id.* at 4–5. There, the district court had affirmed the magistrate judge's exclusion of Dr. Kelley because he did not qualify to testify as an expert. *Malin*, 2013 WL 12123512, at *5. The court pointed out that "Dr. Kelley has admitted that he has no education or training in handwriting analysis, computer-generated forgeries, or forensic document examination, and that he is not a certified computer or forensic document examiner." *Id.* at *4. Specifically, the court noted that "Dr. Kelley has never taught courses, given lectures,

or authored works on document examination or handwriting analysis," and that he had "testified that he first examined a document in January 2012, when he determined that his own mortgage note was a forged document." *Id.* The court further explained that "even if [it] had determined that Dr. Kelley qualified as an expert, the court could not find that his methodology is reliable." *Id.* at *2. This was because "Dr. Kelley's methods have not been peer-reviewed, he has not performed error-rate testing, and the methods have not been accepted by the scientific community at large[.]" *Id.*

Deutsche Bank argues that Dr. Kelley's qualifications and unreliable methodology have not substantially changed since *Malin*. Dkt. 96 at 4–5. Deutsche Bank points to a 2023 case where the Washington Court of Appeals affirmed the trial court's decision to exclude Dr. Kelley under the *Frye* test, because "his training and his experience do not rise to the level of the Court finding him to be an expert in this area." *Id.* at 4; Dkt. 68-1 at 4; *21st Mortg. Corp. v. Nicholls*, 25 Wn. App. 2d 795, 813, 525 P.3d 962, *review denied sub nom. Robertson v. Residential Funding Co., LLC*, 1 Wn. 3d 1023, 532 P.3d 162 (2023).

There, the trial court acknowledged that "Kelley had '10 years['] experience examining documents,' 'has some particularized knowledge,' has 'some education,' which 'makes him maybe more familiar with this area . . . than a lay person may be.' Kelley was also a member of some relevant professional associations that do 'almost the same thing' he does." *21st Mortg. Corp. v. Nicholls*, 25 Wn. App. 2d at 813. Still, the court found his "training and his experience do not rise to the level" of an expert because "[n]one of Kelley's formal education and decades-long work experience was in forensic document examination"; "Kelley has not taken any formal forensic document examination courses or training,"; "Kelley did not receive supervised training under a forensic document examiner or complete any apprenticeship in the area of forensic

document examination"; and "Kelley described himself as 'an electrical and computer engineer.'" *Id.*

Deutsche Bank argues that since Plaintiffs cannot establish that Dr. Kelley is qualified or that he applies a reliable methodology, Dr. Kelley's testimony on the authenticity of the promissory notes should be excluded. Dkt. 96 at 5.

1. *Qualifications*

The Court agrees that Dr. Kelley is not qualified to provide expert testimony on forensic document examination because he lacks the requisite "knowledge, skill, experience, training, or education" in the field. Fed. R. Evid. 702. His testimony, curriculum vitae, and declaration show that he does not have formal education, experience, or training related to forensic document analysis. *See* Dkts. 79, 79-1, 79-2, 79-3, 100, 100-1, 100-2, 100-3.

First, Dr. Kelley has no formal education or training in forensic science. He received a Bachelor of Arts from San Jose State University in mathematics. Dkt. 79-1 at 3. He then earned a master's in electrical engineering and a Ph.D. in electrical and computer engineering from the University of California, Santa Barbara ("UCSB"). *Id.* Dr. Kelley's formal training at Litton Industries and UCSB is on "image processing & wavelet signal analysis" and "digital signal processing" none of which relate to forensic science or document examination. *See id.* at 3–4.

The only items listed on Dr. Kelley's curriculum vitae related to forensic document examinations are his training in "ultraviolet and infrared signature detection in forensic science" and experience as an "independent forensic engineering consultant." *Id.* at 3–4. Under his work as "consultant," Dr. Kelley lists "[f]orensic document analysis using image-processing and scanning technologies," "[s]pecialized in identification of reconstructed mortgage documents used in foreclosure," and "[e]xpert witness and consultant in federal and state litigation." *Id.* at 4. But "[n]one of these items provide any specific work experience in the area of forensic document

examination." *Slovak v. Golf Course Villas Homeowners Aossication*, No. 313CV00569RCJCBC, 2019 WL 12372104, at *9–10 (D. Nev. Jan. 15, 2019) (concluding that "Kelley simply does not possess the requisite 'scientific knowledge' required to qualify as an expert in the field of forensic document examinations."). Dr. Kelley's work as a consultant—in which he has been excluded repeatedly from testifying in court—cannot provide the experience necessary to support his testimony.

Furthermore, though Dr. Kelley lists "select legal cases" where he has provided expert testimony, Dr. Kelley concedes that his opinion has been excluded in over twenty cases. *See* Dkt. 85 at 8 ("Q. And you believe your opinion has been excluded in probably more than 20 cases? A. That's right."). Dr. Kelley also points to three articles he "published on Academia.edu." Dkt. 79 ¶ 12. But again, none of these articles were peer-reviewed and any person who signs up for an account on Academia.edu can "publish" their work by uploading their paper to the website. *See How do I add a single document?*, https://support.academia.edu/hc/en-us/articles/360043383793-How-do-I-add-a-single-document (last accessed, Aug. 27, 2025). Other federal courts have rejected "Dr. Kelley's testimony and claims that his knowledge in using microscopes, scanners, imaging technology, or computer programs provides him the requisite skill or knowledge to be an expert in the area of forensics, forensic sciences, or forensic document analysis or examinations." *Slovak*, 2019 WL 12372104, at *10. Plaintiffs have not provided any evidence apart from similar testimony and claims that Dr. Kelley is qualified to give opinions on forensic document examination. *See* Dkts. 79, 79-1, 79-2, 79-3, 100, 100-1, 100-2, 100-3.

Because "Dr. Kelley lacks the required prior relevant work experience or professional experience to qualify as an expert in this area," the Court excludes Dr. Kelley's testimony on this basis. *Slovak*, 2019 WL 12372104, at *10.

2.   *Reliability*

Dr. Kelley's expert testimony also fails to meet the reliability threshold. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (expert opinion testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."). Thus, even if Dr. Kelley was a qualified expert, his testimony would be excluded on this additional basis.

Dr. Kelley described the following method he used to reach the opinion that the five promissory notes at issue are "reproductions" that are "likely generated from archived scans of the original documents, which were destroyed as part of Industry wide policy." Dkt. 79-2 at 3. First, he "scanned all five of the ARNs, deeds of trust and riders provided for inspection at attorney Sagara's office with an Epson V-550 photo scanner." Dkt. 79 ¶ 5. He then examined the scanned copies by applying the "Standard for Examination of Documents Produced with Liquid Ink Jet Technology" established by SWGDOC. *Id.* ¶¶ 5, 10. Based on his observations of the scanned documents, such as an examination of satellite inkjet droplets and CMYK color separation, Dr. Kelley concluded that the notes provided by the Trusts did not contain "a wet-ink signature produced by pen." Dkt. 79-2 at 2. Each note was instead a "digitally printed copy of a previously existing note, most likely created using archived image files after the destruction of the original document." Dkt. 79 ¶ 7.

Review of the SWGDOC shows Dr. Kelley did not apply it in the way it is intended. The "Standard for Examination of Documents Produced with Liquid Ink Jet Technology" applies to "examinations involving copiers, printers, facsimile devices, and multifunction devices using ink jet technology." SWGDOC, *Standard for Examination of Documents Produced with Liquid Ink Jet Technology*,

https://www.swgdoc.org/documents/SWGDOC%20Standard%20for%20Examination%20of%20

ORDER GRANTING DEUTSCHE BANK'S MOTION TO EXCLUDE EXPERT WITNESSES - 14

Documents%20Produced%20with%20Liquid%20Ink%20Jet%20Technology.pdf. In other words, this standard is meant for examination of documents *originally produced* with an ink jet printer. *See id* ("By following these procedures, a forensic document examiner can reliably reach an opinion concerning whether two or more documents produced with ink jet technology are from the same device, whether a particular device created the document, or the determination of the make or model of a device."). Here, Dr. Kelley is applying a method that assumes the document was produced by an inkjet, to then *prove* that the document was created by an ink jet printer.

This is not the first time Dr. Kelley has used the SWGDOC method in this way to conclude that mortgage documents were a "copy" or a "forgery." *Slovak*, 2019 WL 12372104, at *11. In *Slovak*, the district court rejected Dr. Kelley's "attempts to use [SWGDOC] standards in reverse." *Id.* The court pointed out, "his methodology involves taking a photograph or scan of an original document and then attempting to prove the document—which is purported to be an original—was actually created by an ink jet printer." *Id.* The court further explained, "[h]is methodology has nothing to do with attempting to determine which ink jet device was used to create a document or if two documents were produced by the same device," which is the intended purpose of the SWGDOC standard. *Id.*

Like in *Slovak*, Plaintiffs here have not established that Dr. Kelley's "opinion reflects a reliable application of the principles and methods to the facts of the case" by a preponderance of evidence. *Engilis*, 2025 WL 2315898, at *3 (citing Fed. R. Evid. 702). In their supplemental brief, Plaintiffs note that "Kelley affirms his use of SWGDOC standards, which are broadly accepted across both private and government forensic document laboratories." Dkt. 98 at 8. But as the Court explained above, while SWGDOC standards themselves may be accepted by forensic examiners, Kelley's *application* of the standard is unreliable because it applies only to

ORDER GRANTING DEUTSCHE BANK'S MOTION TO EXCLUDE EXPERT WITNESSES - 15

documents created by an inkjet printer. Plaintiffs have not shown the standard can be used to determine whether a document contains an original signature. *See Slovak*, 2019 WL 12372104, at *11. Kelley's lack of reliability[1] is further underscored by the fact that other courts have been "unable to locate any federal case wherein Dr. Kelley has been qualified as an expert in forensic document examination or where his methods have been deemed reliable." *Slovak*, 2019 WL 12372104, at *12; *see, e.g.*, *Malin*, 2013 WL 12123512, at *1 (excluding Dr. Kelley for lack of qualifications and reliability); *McDonald v. OneWest Bank, FSB*, No. C10-1952RSL, 2013 WL 12116149, at *1 (W.D. Wash. Aug. 23, 2013) (same).

The Court "cannot abdicate its role as gatekeeper" and excludes Dr. Kelley's testimony as unreliable under Rule 702. *Engilis*, 2025 WL 2315898, at *6.

**C.     William Paatalo's testimony must also be excluded.**

   *1.     Qualifications*

Deutsche Bank also moves to exclude Plaintiffs' expert on mortgage securitization and chain of title analyses, William Paatalo. Dkt. 96 at 5–7. Deutsche Bank argues that Paatalo's testimony should be excluded because "[b]y his own admission, Mr. Paatalo has no expertise in forensic document examination or handwriting analysis" and he "offers no methodology regarding the same." *Id.* at 5. Deutsche Bank contends that Paatalo's testimony is "nothing more than his review of recorded documents relating to the subject loans[.]" *Id.* at 6. Deutsche Bank

---

[1] Plaintiffs offer a declaration by Michael N. Wakshull that was prepared for a separate state court case in 2021. Dkt. 79-5. In that declaration, Wakshull concludes that based on his "analysis of Dr. Kelley's report and subsequent discussion with him about the methodology used to determine the results stated in his report" he found that Dr. Kelley "did follow generally accepted practices for forensic document examination." *Id.* at 3. The Court will not consider Wakshull's report as it "is nothing more than an attempt to bolster the credibility of Dr. Kelley and the legitimize 'opinions' reached by him" and because "[t]his type of 'expert' testimony is not proper and is impermissible." *Slovak*, 2019 WL 12372104, at *12 (citing *United States v. Rivera*, 43 F.3d 1291, 1295 (9th Cir. 1995) (expert is not permitted to testify specifically to bolster the credibility of another witness)).

cites *Tadros v. Wilmington Tr., Nat'l Ass'n*, No. 3:17-CV-01623-AA, 2018 WL 1924464, at *4 (D. Or. Apr. 23, 2018) in support of their argument that Paatalo's declaration does not reflect any particular "knowledge, skill, experience, training, or education" to qualify him as an expert. *Id.* at 6–7.

The Court agrees that Plaintiffs have not established by a preponderance of evidence that Paatalo is qualified to opine about the authenticity of the promissory notes. Paatalo has no qualifying training or experience that would allow him to differentiate original notes from forged notes. *See* Dkt. 81-1. Paatalo's curriculum vitae instead shows that he worked as a police officer, loan officer, and has been working as a private investigator since 2009. *Id.* at 2–3. And though Paatalo testified that he is "familiar with and ha[s] sufficient training and expertise to qualify as an expert," Dkt. 81 ¶ 4, his declaration does not show what "knowledge, skill, experience, training, or education" he applied to reach his opinion that the promissory notes were fabricated. *Id.* ¶ 33; Fed. R. Civ. 702.

On this point, *Tadros v. Wilmington Trust, National Association* is instructive as the facts and legal claims in *Tadros* are very similar to those here. There, the plaintiffs took out a loan from Countrywide Home Loans, Inc. to finance the purchase of real estate, secured by a Deed of Trust. 2018 WL 1924464, at *1. Countrywide's security interest in the property was ultimately assigned to Wilmington. *Id.* at *1–2. After the plaintiffs defaulted on their monthly payments, they sued Wilmington, arguing that it "lacked legal authority to foreclose on their property via a non-judicial foreclosure sale." *Id.* at *3. Plaintiffs asserted that "the endorsement in blank on the promissory note is a forgery" and this argument was largely supported by the expert declaration of Paatalo. *Id.*

Paatalo submitted an expert declaration opining that the assignment of the mortgage to Wilmington was "fraudulent because the endorsement in blank attached to the assignment of the

note to Wilmington . . . is a forgery." *Id.* at *4. The court found Paatalo's declaration inadmissible because it failed the first prong of Rule 702's expert qualification requirements. *Id.* The court explained that "Mr. Paatalo appears to have gathered all this foundational information through searching websites on the internet" and "purports to rely on information that is available to the general public through public websites." *Id.* The court thus concluded that "he does not appear to have brought any 'scientific, technical, or other specialized knowledge' to bear in reach[ing] his conclusions." *Id.* (citing Fed. R. Evid. 702).

Just as in *Tadros*, here Paatalo relies on publicly available documents or unrelated emails, *see* Dkt. 81 ¶ 6, to reach a subjective opinion that "Defendants are relying upon fabricated and unauthorized documents, including assignments executed without legal authority[.]" *Id.* ¶ 33. For example, as the basis for his opinion, Paatalo reviewed government records and publicly filed reports, testimony from other cases, and the recorded assignments of the deeds. Dkt. 81 at 19–20; *see* Dkt. 18-2 (five promissory notes); Dkt. 18-3 (Declaration of Jess Almanza in King County, WA, Case No. 20-2-08633-9 KNT); Dkt. 18-4 (Deposition Transcript of Sherry Larsen), 18-5 (five assignments of deed of trust); Dkt. 18-6 (Chase Internal Emails and Discovery Responses (Lincoln County, OR, Case No. 18CV44633)); Dkt. 18-7 (WAMU Bankruptcy Examiner's Final Report (retrieved from Pacer)); Dkt. 18-8 (Florida Bankers Association Letter to Florida Supreme Court (2009) – Case No. SC09-1460); Dkt. 18-9 (OCC Advisory Letter); Dkt. 18-10 (Consent Judgment); Dkt. 18-11 (same Consent Judgment); Dkt. 18-12 (2016 FDIC Settlement Agreement involving DBNTC, JPMorgan Chase, and FDIC).

Paatalo's opinions do not rely on any "knowledge, skill, experience, training, or education" in a relevant discipline to determine the authenticity of the notes. Fed. R. Evid. 702; *see Tadros*, 2018 WL 1924464, at *4. Instead, Paatalo draws broad conclusions (many of them inadmissible legal conclusions) based on his subjective interpretation of the cited documents. For

ORDER GRANTING DEUTSCHE BANK'S MOTION TO EXCLUDE EXPERT WITNESSES - 18

example, Paatalo concludes that there "is no reliable evidence that the Trust lawfully received or held any of the White loans." Dkt. 81 at 11. In support of this opinion, Paatalo asserts that "the WAMU Bankruptcy Examiner's Final Report . . . confirmed that large volumes of loans were never properly transferred into REMIC trusts" and this "is further corroboration of the fact that the trust in this matter, very likely, never received the transfer of any assets, including the White assets[.]" *Id.* ¶ 20. In another example, Paatalo searched U.S. Securities and Exchange's EDGAR database to retrieve Long Beach Security Corporation's Pooling and Servicing Agreement ("PSA"). *Id.* ¶¶ 16–17. Paatalo then opines that because the PSA "is unsigned and unexecuted, . . . there is no evidence that this trust was ever properly formed or funded with any assets, including the White loans at issue in this case." *Id.* ¶ 17.

Paatalo merely offers his own individual interpretation of these documents, devoid of any relevant expertise, to reach the conclusion that Defendants do not possess the original promissory notes. This is insufficient to qualify Paatalo as an expert in this case. *See Cole v. JPMorgan Chase Bank, N.A.*, No. C13-959RSL, 2014 WL 1320140, at *3 (W.D. Wash. Mar. 31, 2014) ("Although Ms. Gileno's resume suggests that she has received training regarding fraud generally, Plaintiff has not satisfied her burden of demonstrating that Ms. Gileno is qualified to give an opinion as to whether the foreclosure on Plaintiff's property complied with Washington law."); *Erhart v. BofI Holding, Inc.*, 445 F. Supp. 3d 831, 841 (S.D. Cal. 2020) (excluding the proposed damages expert from opining on the total personnel cost because "[the defendant] fails to demonstrate that [the expert's] summary of its alleged employee costs involves anything other than basic arithmetic"); *Prall v. Ford Motor Co.*, No. 214CV001313MMDGWF, 2017 WL 361545, at *3 (D. Nev. Jan. 24, 2017) (proffered expert's testimony was not based on "the knowledge and experience of his discipline," because he had "not provided any explanation for

his opinion other than the existence of circumstantial evidence—evidence which a lay person is perfectly capable of understanding.").

Finally, though Paatalo asserts that he is relying on his experience as a private investigator, his testimony is not necessary to assist the jury in interpreting the documents that provide the basis for his opinion (assuming Plaintiffs could show those documents were relevant evidence in this case). Dkt. 81 ¶ 4; *see* Fed. R. Evid. 702. "Expert testimony is admissible under Fed. R. Evid. 702 if it addresses an issue beyond the common knowledge of the average layperson." *United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002) (citation modified). But "Paatalo's investigation is not the type of inquiry contemplated by Rule 702 to be undertaken by experts." *Tadros*, 2018 WL 1924464, at *4.

Because Paatalo does not qualify as an expert witness under Federal Rule of Evidence 702, the Court grants Deutsche Bank's request and excludes Paatalo's testimony.

## IV.   CONCLUSION

For these reasons, the Court GRANTS the request to exclude expert testimony made within Deutsche Bank's summary judgment motion, and the Court ORDERS that Dr. James Kelley and William Paatalo are excluded from testifying as expert witnesses in this case.

Dated this 2nd day of September, 2025.

Tiffany M. Cartwright
United States District Judge