1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CHURCH OF THE GARDENS et al.,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>QUALITY LOAN SERVICES<br><br>CORPORATION et al.,<br><br>　　　　　Defendant. | Case No. 3:23-cv-06193-TMC<br><br>ORDER GRANTING DEUTSCHE BANK'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

## I.    INTRODUCTION

This case arises from Plaintiff Alvin White's default on five mortgage loans, secured by five separate properties in Fife, Washington. On January 5, 2024, Defendant Deutsche Bank National Trust Company, as Trustee for Holders of Long Beach Mortgage Loan Trust 2006-4, Asset-Backed Certificates, Series 2006-4 ("2006-4 Trust") and Long Beach Mortgage Loan Trust 2006-5 ("2006-5 Trust") (collectively "the Trusts"), sold two of the five properties through a nonjudicial foreclosure proceeding.

Plaintiffs White and Church of the Gardens filed suit, alleging that Deutsche Bank did not possess the original promissory notes required to proceed with the nonjudicial foreclosure. Plaintiffs seek to restrain the future sale of the remaining three properties and request damages

for the prior two sales. Plaintiffs allege that selling the properties violated the Washington Deed of Trust Act ("DTA") and Washington Consumer Protection Act ("CPA"), as well as breached the loan contract. Plaintiffs also raise federal and state constitutional challenges to the DTA. Finally, Plaintiffs seek a declaration on the meaning and governing version of RCW 61.24.130, the provision in the DTA allowing the borrower to restrain a trustee's sale.

On April 30, 2025, Deutsche Bank moved for summary judgment, arguing that Plaintiffs had failed to put forth evidence from which a jury could find that the Trusts did not hold the original notes. Dkt. 67. Plaintiffs also cross-moved for summary judgment, contending that "there is irrefutable evidence that promissory notes—including those signed by White in 2006—were routinely destroyed by the financial industry shortly after execution." Dkt. 76 at 8–9.

Upon reviewing the motions and briefing, the Court ordered supplemental briefing because both parties did not address all the claims raised in Plaintiffs' amended complaint, the relevant standard for challenging expert testimony, and whether Church of the Gardens has standing to pursue its claims. Dkt. 91. On July 16, 2025, the parties filed supplemental briefs. Dkts. 96, 97, 98, 99.

Having considered the briefing, governing law, and the balance of the record, the Court GRANTS Deutsche Bank's motion for summary judgment (Dkt. 67). Plaintiffs' cross-motion for summary judgment (Dkt. 76) is DENIED as moot.

## II.    BACKGROUND

### A.    Factual Background

The following background facts are either not genuinely disputed or viewed in the light most favorable to Plaintiffs, the non-moving party. Additional material facts for each claim brought by Plaintiffs are discussed in the sections corresponding to those claims.

1.    *White executed five promissory notes and deeds of trust to secure loans borrowed from Long Beach Mortgage Company.*

In February 2006, White purchased five properties—Lot 11, Lot 16, Lot 7, Lot 10, and Lot 12—using funds borrowed from Long Beach Mortgage Company. White executed five promissory notes and deeds of trust to secure the loans. *See* Dkts. 70-1, 70-8, 70-14, 70-19, 70-24 (promissory notes); Dkts. 70-2, 70-9, 70-15, 70-20, 70-25 (deeds of trust). Defendant Quality Loan Services Corporation of Washington ("QLS") is acting as the successor trustee for Lots 16 and 11, *see* Dkt. 72 at 2, and Defendant MTC Financial Inc. (doing business as "Trustee Corps") is acting as the successor trustee for Lots 7, 10, and 12, *see id.* at 7–8, 10, 13–14. QLS sold Lots 11 and 16 to the Trusts on January 5, 2024 at a public auction. *See* Dkt. 70-7, 70-13. Trustee Corps recorded a Notice of Trustee's Sale in Pierce County, Washington for Lots 7, 10, and 12, *see* Dkt. 72 at 16–20, 41–48, 53–54, but it later cancelled the sale by recording a Discontinuance of Sale, *see id.* at 22–23, 50–51, 53–54. Since this case has been pending, Trustee Corps has not served or recorded any new Notice of Trustee's Sales for the remaining Lots. *Id.* at 4.

a.    *Loan 3221*

White executed a promissory note for the principal sum of $333,000, which was secured by a Deed of Trust encumbering real property Lot 11. Dkt. 70-1; Dkt. 70-2. The Deed of Trust was recorded as Instrument No. 200603030818 on March 3, 2006 in Pierce County, Washington. Dkt. 70-2 at 2. Loan 3221 went into default after White missed the January 1, 2009 payment. Dkt. 70 ¶ 12.

On February 28, 2009, the Deed of Trust was transferred to Deutsche Bank as Trustee for the 2006-4 Trust, which was assigned as the beneficiary. Dkt. 70-3. The mortgage was also transferred to Deutsche Bank on January 27, 2023, assigning 2006-4 Trust as the beneficiary. Dkt. 70-4. Both assignments were recorded in Pierce County, Washington. Dkt. 70-3 at 2;

Dkt. 70-4 at 2. The document control notes by the mortgage servicer, Select Portfolio Servicing, Inc. ("SPS"), state that the promissory note for Loan 3221 was sent by Deutsche Bank to SPS to be placed in SPS's vault in Salt Lake City, Utah on May 3, 2019. Dkt. 70 ¶ 11; Dkt. 70-5 at 2, 4. On October 14, 2024, the note was sent to the Trusts' counsel's office in Seattle, Washington. Dkt. 70 ¶ 15; Dkt. 70-5 at 5.

Due to the default, Loan 3221 was referred for a nonjudicial foreclosure and successor trustee QLS recorded a Notice of Trustee Sale on May 10, 2023 in Pierce County, Washington. Dkt. 70-6. The Notice of Trustee Sale indicated that the amount in arrears was $562,990.56 and that the default "must be cured by 9/4/2023 (11 days before the sale date), or by other date as permitted in the Note or Deed of Trust, to cause a discontinuance of the sale." *Id.* at 3. It also noted that Lot 11 was being sold "to secure an obligation in favor of LONG BEACH MORTGAGE COMPANY, as original beneficiary, the beneficial interest in which was subsequently assigned to Deutsche Bank National Trust Company, as Trustee, in trust for registered Holders of Long Beach Mortgage Loan Trust 2006-4, Asset-Backed Certificates, Series 2006-4, the Beneficiary[.]" *Id.* at 2.

After the sale was postponed twice, it was completed on January 5, 2024 at a public auction and Lot 11 was sold to the 2006-4 Trust for the amount of $650,250. Dkt. 70-7 at 3. The Trustee's Deed Upon Sale was recorded in Pierce County, Washington under Instrument No. 202101160348 on January 16, 2024. *Id.* at 1.

### b. Loan 1002

White executed a second promissory note for the principal sum of $382,500, which was secured by a Deed of Trust encumbering real property Lot 16. Dkt. 70-8; Dkt. 70-9. The Deed of Trust was recorded as Instrument No. 200603030826 on March 3, 2006 in Pierce County,

Washington. Dkt. 70-9 at 2. After White missed the January 1, 2009 payment, Loan 1002 went into default. Dkt. 70 ¶ 21.

SPS's document control notes show that the promissory note for Loan 1002 was sent to SPS from Deutsche Bank on July 2, 2015 and held in SPS's vault in Salt Lake City, Utah. Dkt. 70-11 at 4. On December 2, 2024, the note was sent to the Trusts' counsel's office in Seattle, Washington. Dkt. 70 ¶ 24; Dkt. 70-11 at 7.

Loan 1002 was referred for a nonjudicial foreclosure following White's default in payments. Dkt. 70 ¶ 21. Successor trustee QLS recorded a Notice of Trustee Sale on May 17, 2023 in Pierce County, Washington. Dkt. 70-10. The total sum in arrears was $617,254.33 and the Notice of Trustee Sale stated that Lot 16 was being sold "to secure an obligation in favor of LONG BEACH MORTGAGE COMPANY, as original beneficiary, the beneficial interest in which was subsequently assigned to Deutsche Bank National Trust Company, as Trustee, in trust for registered Holders of Long Beach Mortgage Loan Trust 2006-5, Asset-Backed Certificates, Series 2006-5, the Beneficiary[.]" *Id.* at 2–3.

The sale was completed at a public auction on January 5, 2024, and Lot 16 was sold to the 2006-5 Trust for $722,500. Dkt. 70-13 at 3. The Trustee's Deed Upon Sale was recorded in Pierce County, Washington under Instrument No. 202401160353 on January 16, 2024. *Id.* at 1.

### c.   Loan 3205

White executed a third promissory note for the principal sum of $333,000, which was secured by a Deed of Trust encumbering real property Lot 7. Dkt. 70-14; Dkt. 70-15. The Deed of Trust was recorded as Instrument No. 200603030820 on March 3, 2006 in Pierce County, Washington. Dkt. 70-15 at 2.

On February 28, 2009, the Deed of Trust was transferred to Deutsche Bank as Trustee, naming the 2006-5 Trust as the beneficiary. Dkt. 70-16. The assignment was recorded in Pierce

County, Washington on April 15, 2009. *Id.* at 2. A Corporate Assignment of Deed of Trust was also later recorded on February 7, 2023, which again named 2006-5 Trust as the beneficiary. Dkt. 70-17 at 2.

SPS's document control notes show that on October 16, 2024, Deutsche Bank sent the promissory note for Loan 3205 to SPS to be held in its vault in Salt Lake City, Utah. Dkt. 70 ¶ 29; Dkt. 70-18 at 3. On October 21, 2024 the note was then sent to the Trusts' counsel's office in Seattle, Washington, where it is currently held. Dkt. 70-18 at 3.

### d.  Loan 3213

White executed a fourth promissory note for the principal sum of $382,500, which was secured by a Deed of Trust encumbering real property Lot 10. Dkt. 70-19; Dkt. 70-20. The Deed of Trust was recorded as Instrument No. 200603030822 on March 3, 2006 in Pierce County, Washington. Dkt. 70-20 at 2. After White failed to make the May 1, 2018 payment, Loan 3213 went into default. Dkt. 70 ¶ 36.

The Deed of Trust was transferred to Deutsche Bank on February 28, 2009, naming Trust 2006-5 as the beneficiary. Dkt. 70-21. This assignment was recorded in Pierce County, Washington on April 9, 2009 under Instrument No. 200904030273. *Id.* at 2. On May 25, 2016, a Corporate Assignment of Deed of Trust was recorded under Instrument No. 201605250006, again naming 2006-5 Trust as the beneficiary. Dkt. 70-22.

SPS's document control notes state that SPS's vendor, Richmond Monroe Group, held the promissory note for Loan 3213 until it sent the note to Trusts' counsel's office in Seattle, Washington on October 8, 2024, where it is currently stored. Dkt. 70 ¶ 35; Dkt. 70-23 at 3.

### e.  Loan 3239

White executed a fifth promissory note for the principal sum of $333,000, which was secured by a Deed of Trust encumbering real property Lot 12. Dkt. 70-24; Dkt. 70-25. The Deed

1    of Trust was recorded as Instrument No. 200603030824 on March 3, 2006 in Pierce County,

2    Washington. Dkt. 70-25 at 2. Loan 3239 went into default after White missed his March 1, 2018

3    payment. Dkt. 70 ¶ 42.

4          On February 28, 2009, the Deed of Trust was transferred to Deutsche Bank as Trustee for

5    the 2006-5 Trust, which was the assigned beneficiary. Dkt. 70-26 at 2. This assignment was

6    recorded in Pierce County, Washington on April 9, 2009 under Instrument No. 200904090276.

7    *Id.* On June 29, 2016, a Corporate Assignment of Deed of Trust was recorded under Instrument

8    No. 201606290260, listing 2006-5 Trust as the beneficiary. Dkt. 70 ¶ 39; Dkt. 70-27 at 3.

9          SPS's document control notes reflect that SPS received the note for Loan 3239 from

10   Deutsche Bank on October 16, 2024. Dkt. 70-28 at 3. Two days later, SPS sent the note to

11   Trusts' counsel's office, where it is currently held. *Id.*; Dkt. 70 ¶ 41.

12         2.    *Church of the Gardens*

13         Church of the Gardens ("COTG") is a nonprofit organization with a mission to "minister

14   to and protect those in need such as the hungry, the sick, the poor, and the homeless, the

15   indebted, the enslaved, the vulnerable, and all others who are unfairly prevented from exercising

16   their inalienable God-given natural rights." Dkt. 102-1 at 3; Dkt. 102-3 at 2. Part of COTG's

17   mission is "to engage in activities necessary for the accomplishment of the mission" and "to

18   oppose all, which by design or through corruption, are inimical to the church's mission[.]"

19   Dkt. 102-1 at 3; Dkt. 102-3 at 2. COTG "was born out of the government corruption which is

20   claimed to exist in this case with regards to governments', government institutions' and their

21   officials' (including 'judges') unlawful removal of people from their homes for the benefit of

22

23

24

money changers,[1] often causing death and injury to persons and always taking their real property." Dkt. 102 ¶ 21.

COTG is overseen by the Governing Board, which is the "church's final interpretive authority on the Bible's meaning and application as it applies to the mission and faith of this Church." Dkt. 102-1 at 3. The Governing Board is composed of seven directors—three founding directors and four ministry directors. *Id.* at 5. The ministry directors represent the Economic and Social Justice Ministry, the Opposition to Governmental Injustice Ministry, the Affiliated Church, Faith Based Organizations, and Chapel Ministry, and the Education, Workship, and Outreach Ministry. *Id.* at 5–6.

COTG has been a party to other cases challenging the nonjudicial sale of properties. Dkt. 102 ¶ 14; *see* Dkt. 102-6. Scott E. Stafne is a "Church Advocate" representing COTG in these cases. Dkt. 102 ¶¶ 14, 20. Stafne has "help[ed] [] write the Church's mission statement, statement of faith, and bylaws" and works to prevent the "unlawful exercise of state authority on behalf of money changers to take real properties from their owners in Washington State." *Id.* ¶¶ 20, 35.

## B.    Procedural Background

Plaintiffs White and COTG filed suit in Pierce County Superior Court on December 13, 2023 against Defendants QLS, Trustee Corps, Deutsche Bank National Trust Company, 2006-4 Trust, 2006-5 Trust, and the State of Washington. Dkt. 1-2. Deutsche Bank removed the case to

---

[1] In their cross-motion for summary judgment, *see* Dkt. 76 at 9, Plaintiffs adopt the term "money changers" to refer to the financial industry. Plaintiffs assert that the "term is used deliberately and with respectful awareness of its biblical weight" given that "[i]n the Scripture, the money changers were those who exploited sacred obligations by manipulating the means of exchange within the Temple. . . . [and similarly,] today's financial institutions manipulate legal forms and credit instruments—converting the borrower's own promise into a source of profit for the money changer who risks nothing." *Id.*

ORDER GRANTING DEUTSCHE BANK'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 8

this Court on December 28, 2023. Dkt. 1. On January 8, 2024, Plaintiffs amended their complaint. Dkt. 8.

The 109-page complaint contained numerous allegations and legal theories for why the past or potential future nonjudicial sale of White's properties violates "the organic law of this Nation and the State of Washington." *Id.* ¶¶ 1.3, 4.18. Plaintiffs' core allegation is that the five promissory notes at issue were lost or destroyed within a year of when the notes were signed by White, thus cancelling the debt related to the mortgage loans. *Id.* ¶¶ 3.24, 3.28. Since the notes were lost or destroyed, Plaintiffs assert that they "were never transferred into either of the Defendant Trusts or any other trust." *Id.* ¶ 3.27. As a result, Plaintiffs allege that Defendants cannot enforce the notes against White and any attempts to do so are unlawful. *Id.* ¶¶ 4.11–4.18.

Plaintiffs assert the following causes of action: (1) QLS's sale of Lot 11 and Lot 16 under the DTA violates the due process clause, equal protection clause, and takings clause of the U.S. Constitution; (2) the sale violates Article 1, section 10, Article IV, section 6, and Article V, section 6 of the Washington Constitution; (3) the sale violates the DTA and CPA, and constitutes a breach of contract. *Id.* ¶¶ 4.7, 3.99(H), 3.99(I), 3.98, 4.6, 4.8, 4.11–4.18.

Plaintiffs further assert that they are entitled to a declaration that the 2006 version of RCW 61.24.130 is the governing law and a declaration as to the meaning of the current version of RCW 61.24.130. *Id.* ¶¶ 4.1, 4.2. Plaintiffs also seek an injunction restraining Trustee Corps from proceeding with the nonjudicial sale of the remaining Lots 7, 10, and 12, *id.* ¶¶ 4.9–4.10, and request damages from QLS and Deutsche Bank for the prior sale of Lots 11 and 16, *id.* ¶¶ 4.11–4.18.

On January 11, 2024, the State of Washington moved to dismiss for failure to state a claim, Dkt. 12, which the Court granted, Dkt. 39. The Court also granted Trustee Corps' motion to determine validity of nonmonetary status. Dkts. 51, 74. Trustee Corps was excused from

participating in the litigation, though it remains bound by this Court's ruling on Plaintiffs' claims. Dkt. 74 at 7.

On April 30, 2025, Deutsche Bank moved for summary judgment, Dkt. 67, and Plaintiffs cross-moved for summary judgment, Dkt. 76. QLS joined Deutsche Bank's motion for summary judgment. Dkt. 73. After reviewing the motions and briefing, the Court ordered parties to submit two supplemental briefs. First, the parties were asked to file a brief addressing the Federal Rule of Evidence 702/*Daubert* standard for the expert witnesses whose testimony they argued was unreliable. Dkt. 91; *see also* Dkt. 104 at 3–4. Second, the parties were asked to file a brief addressing (1) Plaintiffs' federal and state constitutional claims challenging the Deed of Trust Act; (2) Plaintiffs' declaratory judgment claims with respect to RCW 61.24.130; (3) Plaintiffs' claims for equitable relief; and (4) whether Plaintiff Church of the Gardens (as opposed to White) has Article III standing to pursue its claims. *Id.*

Plaintiffs objected to the Court's order for supplemental briefing and moved to recuse the undersigned district judge. Dkt 92. In their objections, Plaintiffs argued that the Court was improperly providing Defendants "an opportunity to make additional arguments pursuant to [FRE] 702 to exclude the Plaintiffs' engineering expert, who had not been timely challenged on such grounds." *Id.* at 2–3. Plaintiffs also disavowed the notion that they "have attempted to exclude the money changers' experts" and asserted that the "record shows (and this Court should know this) that Plaintiffs have not moved to exclude Defendants' expert; rather Plaintiffs rely on Defendants' expert witness graphology-trained handwriting expert, McFarland, to support their theory of the case." *Id.* at 3. In denying Plaintiffs' motion for recusal, the Court rejected as unsupported and conclusory their claim that the Court's order for supplemental briefing was based on bias and animus towards Plaintiffs. Dkt. 93.

ORDER GRANTING DEUTSCHE BANK'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 10

On July 16, 2025, Deutsche Bank filed its supplemental briefs, and moved to exclude Plaintiffs' proffered experts, James M. Kelley, Ph.D., and William Paatalo. Dkt. 96; Dkt. 97. The Court ruled on the challenge to that testimony in a separate order. Dkt. 104. Plaintiffs also filed supplemental briefs. Dkt. 98; Dkt. 99. The motions are ripe for the Court's consideration.

### III.    LEGAL STANDARD

**A.    Standing**

Article III of the U.S. Constitution limits the Court's jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. For a case or controversy to exist, the party bringing the case must have standing. *Perry v. Newsom*, 18 F.4th 622, 630 (9th Cir. 2021). The "irreducible constitutional minimum" of Article III standing requires the plaintiff to show the following three elements: "(1) [The plaintiff] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016). As the party invoking the Court's jurisdiction, the plaintiff "bears the burden of establishing these elements." *Id.*

Injury in fact is the "[f]irst and foremost" of the three elements. *Id.* "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A concrete injury is one that is "real, and not abstract." *Spokeo*, 578 U.S. at 340 (internal quotation marks omitted). "An injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few common examples." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). "A 'particularized injury' is one that 'affect[s] the plaintiff in a personal and individual way.'" *Safer Chems., Healthy Fams. v. U.S. Env't Prot. Agency*, 943 F.3d 397, 411 (9th Cir. 2019) (quoting *Spokeo*, 578 U.S. at 339).

1

2

**B.    Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323.

Generally, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Thus, at summary judgment, the court must resolve "factual issues of controversy in favor of the non-moving party[.]" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) (internal quotations omitted). But conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be presumed. *See Lujan*, 497 U.S. at 889.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## IV.    DISCUSSION

**A.    Church of the Gardens lacks standing to bring its claims.**

The Court asked the parties to brief standing because "it is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (citation omitted); *see also Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1149 (9th Cir. 2024) ("[W]e have an independent obligation to consider standing sua sponte.") (citation modified). "The party invoking federal jurisdiction bears the burden of establishing" Article III standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (citation modified). "Thus, at the summary judgment stage, a plaintiff must offer evidence and specific facts demonstrating each element." *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the United States*, 894 F.3d 1005, 1012 (9th Cir. 2018) (citing *Lujan*, 504 U.S. at 561).

### 1.    Direct Standing

When a plaintiff is an organization, "the standing requirements of Article III can be satisfied in two ways." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). "Either the organization can claim that it suffered an injury in its own right, or alternatively, it can assert 'standing solely as the representatives of its members.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

The "in its own right" line of organizational standing cases come from the Supreme Court's decision in *Havens v. Realty Corp. v. Coleman,* 455 U.S. 363 (1982), where the court held that a concrete and demonstrable injury to the organization's activities demonstrated through a drain on the organization's resources could establish standing. *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019). The Ninth Circuit has interpreted *Havens* to require

that an organization show: "(1) frustration of its organizational mission; and (2) diversion of its

resources to combat the particular [injurious behavior] in question." *Id.* (quoting *Smith v. Pac.*

*Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir 2004)). The organization, however, cannot

"manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a

problem that otherwise would not affect the organization at all." *Id.* (quoting *La Asociacion de*

*Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)).

Importantly, "organizations must satisfy the usual standards for injury in fact, causation, and

redressability that apply to individuals." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602

U.S. 367, 393–94 (2024) (citing *Havens*, 455 U .S. at 378–79).

Deutsche Bank argues that Church of the Gardens ("COTG") lacks standing to bring this

case because it "does not have a 'personal stake in the outcome of the controversy' that would

entitle it to any relief from this Court." Dkt. 97 at 9 (citation omitted). Specifically, Deutsche

Bank points out that the only allegation in Plaintiffs' complaint referencing COTG is that it "is a

Washington not for profit corporation [] operating as a Christian religious organization for the

purpose of achieving its spiritual and religious purposes as per its mission statement as that

statement has been interpreted through COTG's Board of Directors." *Id.* (quoting Dkt. 8 ¶ 1.2).

Deutsche Bank further argues that Plaintiffs have presented no evidence to establish a

relationship between COTG and any part of this case given that the "public records indicate that

COTG is not a record owner of any of the five subject properties, and the loan records show that

COTG is not a party to any of the five subject notes and deeds of trust." *Id.* (citing Dkts. 70-1,

70-2, 70-8, 70-9, 70-14, 70-15, 70-19, 70-20, 70-24, 70-25).

Plaintiffs contend that courts "allow standing where an organization itself suffers a

cognizable injury to its mission or resources[.]" Dkt. 99 at 7 (first citing *Havens*, 455 U.S. at

378–79; and then citing *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021)).

ORDER GRANTING DEUTSCHE BANK'S MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 14

Plaintiffs assert that COTG's mission is "to minister to and protect those in need such as the hungry, the sick, the poor, the homeless, the indebted, the enslaved, the vulnerable, and all others who are unfairly prevented from exercising their inalienable God-given natural rights." Dkt. 99 at 6–7 (citing Dkt. 102-1 at 3). Since COTG's mission statement also includes "engag[ing] in activities necessary for the accomplishment of the mission" and "oppos[ing] all, which by design or through corruption, are inimical to the church's mission," Plaintiffs argue that "defending a member, like Alvin White, from an allegedly fraudulent and unjust foreclosure directly aligns with and is essential to the Church's institutional purpose." *Id.* Plaintiffs contend that the "Church's time, energy, and resources expended to defend White and other members, resist unlawful displacement, and oppose systemic injustice reflect exactly the kind of mission-related institutional injury recognized by the courts." *Id.* at 6.

Plaintiffs' arguments are unpersuasive. The Court first addresses Plaintiffs' contention that COTG has asserted standing in its own right. For this argument, *Rodriguez v. City of San Jose* is instructive. 930 F.3d at 1127. There, the Second Amendment Foundation, Inc., ("SAF") and the Calguns Foundations, Inc. ("CGF") joined Lori Rodriguez as co-plaintiffs in a suit against the City of San Jose alleging that the city unlawfully seized her firearms in violation of her Second, Fourth, Fifth, and Fourteenth Amendment rights. *Id.* at 1127–29. The City of San Jose had filed a petition in state court, "seeking an order of forfeiture based on a determination that the guns' return would likely endanger" Rodriguez's husband, who had previously suffered several mental health crises requiring the assistance of law enforcement. *Id.* at 1127–28.

The Ninth Circuit held that the organizational plaintiffs, SAF and CGF, lacked standing in their own right, because even though "the organizational plaintiffs state in the Complaint that they are seeking prospective injunctive relief 'to prevent future violations of their members' constitutional right[s],' the *Havens* theory of standing they relied on exclusively at summary

judgment is not based on injury to their members." *Id.* at 1135. The Ninth Circuit pointed out that Plaintiffs had not shown that Rodriguez was a member of either SAF or CGF, and that they had "not explained how the City's retention of Lori's guns either impedes their ability to carry out their mission or requires them to divert substantial resources away from the organizations' preferred uses—let alone both." *Id.*

The court noted that SAF and CGF each had unsuccessfully produced "a single affidavit from a high-ranking official to attempt to establish Article III standing." *Id.* In his affidavit, "SAF's executive vice president asserted only that the organization's purpose, 'include[s] education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms [as well as] the consequences of gun control and legislation that impacts the 'right to keep and bear arms.''" *Id.* at 1135–36. "CGF's executive director similarly framed CG's mission as 'promoting education for all stakeholders about California and federal firearms laws . . . and defending and protecting the civil rights of California gun owners.'" *Id.* at 1136. Though both organizations asserted "that they expend resources advising and assisting members and non-members in navigating California's gun laws and attempting to recover confiscated firearms[,] . . . neither organization present[ed] any evidence of expending resources to assist Lori apart from incurring litigation costs as co-plaintiffs in her federal litigation." *Id.*

The Ninth Circuit then explained that the "mere fact that these organizations represent California gun owners and provide legal advice in navigating California's gun laws does not automatically lead to the conclusion that the confiscation and retention of Lori's guns frustrates their missions or requires them to divert resources." *Id.* Since SAF and CGF offered no other theory explaining their organizational harm, "let alone evidence supporting such a theory as required at the summary judgment stage," the Ninth Circuit concluded that they had not demonstrated Article III standing. *Id.*

Here, Plaintiffs assert that they are seeking relief on behalf of White, a COTG member. *See, e.g.*, Dkt. 99 at 6 ("These statements show that defending a member, like Alvin White, from an allegedly fraudulent and unjust foreclosure directly aligns with and is essential to the Church's institutional purpose."). But like in *Rodriguez*, Plaintiffs offer no evidence to establish that White, the individual plaintiff, is a member of COTG. *See generally* Dkts. 101, 102, 102-1, 102-2, 102-3, 102-4, 102-5, 102-6, 102-7, 102-8, 102-9, 102-10, 102-11. Other than White's relationship with COTG as co-plaintiff in a different lawsuit, *see* Dkt. 102-6, none of White's declarations to this Court show he was a member of COTG. *See* Dkts. 20, 45, 78. For sure, Stafne has declared that "[i]n addition to being the Church's Advocate I am one of the Church's members and know that this part of the Church's mission requires the Church and myself (as the Church Advocate and a Church member) to bring those judicial inquiries which I have been asserting on behalf of Church of the Gardens since its founding and which I am asserting here until it is no longer legally tenable for me to do so." Dkt. 102 ¶ 23. Though Plaintiffs' counsel is a member of COTG, the organization cannot rely at summary judgment on a theory of harm that "is not based on injury to [its] members." *Rodriguez*, 930 F.3d at 1135.

But even if the Court assumed Plaintiffs had established that White was a member of COTG, they have not presented evidence that COTG diverted resources away from its preferred uses. *See id.* at 1136; *cf. E. Bay Sanctuary Covenant*, 993 F.3d at 663 (organizations established standing by showing that the government's rule stripping asylum eligibility from every migrant that crossed the border caused "a near complete diversion of [AOL's] resources" because "[c]aring for the often nonlegal needs of these unaccompanied children is not part of AOL's core mission[.]"). Rather, it appears that resources are being expended for COTG's preferred use— filing actions in state and federal courts.

For example, COTG's mission is "to engage in activities necessary for the accomplishment of the mission" and "to oppose all, which by design or through corruption, are inimical to the church's mission." Dkt. 102-1 at 3; Dkt. 102-3 at 2. Plaintiffs have submitted filings from several other mortgage foreclosure cases COTG has been party to, which show that the purported injuries are based on costs COTG incurred by bringing lawsuits. *See, e.g.*, Dkt. 102-6; *see also* Dkt. 99 at 7 ("The Church's time, energy, and resources expended to defend White and other members, resist unlawful displacement, and oppose systemic injustice reflect exactly that kind of mission-related institutional injury recognized by the courts.").

But the Supreme Court's recent opinion in *Food and Drug Administration v. Alliance for Hippocratic Medicine* forecloses Plaintiffs' standing argument. 602 U.S. at 394. There, the organizational plaintiff argued that the FDA's rules "'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education. . . . And all of that has caused the associations to spend 'considerable resources' to the detriment of other spending priorities." *Id.* The Supreme Court rejected this argument, explaining that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*

Here, COTG's injuries of "time, energy, and resources expended" are analogous to those claimed by the plaintiffs in *Alliance for Hippocratic Medicine*. Dkt. 99 at 7. Plaintiffs have presented no evidence to show that Defendants' actions caused COTG to divert substantial resources away from carrying out its organizational mission, let alone from its preferred use. *See Rodriguez*, 930 F.3d at 1135. Because "[a]n organization cannot manufacture its own standing" by spending money to advocate against the defendant's position, Church of the Gardens lacks standing in its own right. *Id.*

ORDER GRANTING DEUTSCHE BANK'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 18

1

2.     *Representational Standing*

2

COTG similarly lacks representational standing to bring these claims on behalf of its

3

members. To invoke "representational . . . standing[,]" the organization must show (1) "its

4

members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to

5

protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the

6

relief requested requires the participation of individual members in the lawsuit." *Students for*

7

*Fair Admissions, Inc.*, 600 U.S. at 199 (quoting *Hunt v. Washington State Apple Advert.*

8

*Comm'n*, 432 U.S. 333, 343 (1977)).

9

Plaintiffs argue that the "evidence presented by the Church through its advocate satisfies

10

all prongs of the Hunt test." Dkt. 99 at 8. But the "first requirement sinks [COTG's] effort to

11

establish standing." *Satanic Temple v. Labrador*, No. 24-1243, --- F.4th -----, 2025 WL 2302188,

12

at *3 (9th Cir. Aug. 11, 2025). Plaintiffs allude to "congregants" who are affected by

13

"nonjudicial sales and related evictions," Dkt. 99 at 8, but they fail to satisfy the general

14

requirement to name affected members. *Id.*; *see Associated Gen. Contractors of Am., San Diego*

15

*Chapter, Inc. v. California Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (plaintiff failed

16

to satisfy the first prong because it did "not identify any affected members by name nor has it

17

submitted declarations by any of its members attesting to harm they have suffered or will

18

suffer[.]"). Apart from their conclusory arguments that "all prongs of the Hunt test" have been

19

satisfied, Plaintiffs have not proffered a single declaration from a COTG congregant asserting an

20

injury caused by Defendants' actions. *See* Dkt. 99 at 8.

21

Instead, Plaintiffs submitted a declaration from Justin Wood, a member of COTG, who in

22

2018 "began volunteering at Stafne Law Advocacy & Consulting." Dkt. 101 ¶ 3. Wood's

23

declaration states that the "Church regularly receives requests from individuals, particularly

24

homeowners facing foreclosure, seeking advocacy or assistance" and "many of these individuals

report consistent and disturbing concerns about unfair practices within Washington's foreclosure process and the judicial system more broadly." *Id.* ¶ 6. The declaration goes on to describe how he has "come to believe that these judicial failures . . . reflect a broader institutional bias that favors purported lenders, servicers, securitized trusts and trustees over homeowners[.]" *Id.* ¶ 11. But nowhere in the declaration does Wood claim that he has been affected by Defendants' conduct. *See generally* Dkt. 101. Because Plaintiffs have not "shown that one of [COTG's] members has suffered or will imminently suffer an injury, [they] [have] not met the burden to establish" representational standing. *Satanic Temple*, 2025 WL 2302188, at *5.

3.    *Plaintiffs' Remaining Standing Theories*

Plaintiffs argue that "when the nonjudicial sales and related evictions of congregants, such as those which are occurring in Washington State disrupt religious missions and interferes with the church member's ability to practice their faith, then the Church can assert its own First Amendment rights." Dkt. 99 at 8. Plaintiffs raise this claim for the first time in their summary judgment motion. *See id.* This claim is untimely, and the Court will not consider a claim that is not properly raised. *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (citation omitted).

Finally, Plaintiffs make a passing reference that COTG may "possibly tak[e] an interest in the properties that got sold." Dkt. 99 at 6; Dkt. 102 ¶ 35. But COTG's hypothetical interest in the sold properties is insufficient to establish that it suffered any concrete injury that is more than an "abstract, generalized grievance." *Meland v. WEBER*, 2 F.4th 838, 844 (9th Cir. 2021) (citation omitted). Plaintiffs have not presented any evidence to show that COTG has an interest in the lots that were sold or in the lots that are potentially subject to foreclosure proceedings. *See* Dkts. 70-1, 70-2, 70-8, 70-9, 70-14, 70-15, 70-19, 70-20, 70-24, 70-25. While a party "may

suffer a concrete, personalized injury stemming from noneconomic harm," the injury must be greater than "the psychological consequence presumably produced by observation of conduct with which one disagrees[.]" *Id.* (citations omitted); *see Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485–86 (1982) ("even though the disagreement is phrased in constitutional terms . . . standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy").

Plaintiffs have not met their burden to show COTG has direct or representational standing. Accordingly, COTG's claims are DISMISSED without prejudice for lack of jurisdiction. *Hampton v. Pac. Inv. Mgmt. Co. LLC*, 869 F.3d 844, 846 (9th Cir. 2017) ("Dismissals for lack of subject-matter jurisdiction . . . must be without prejudice, because a lack of jurisdiction deprives the dismissing court of any power to adjudicate the merits of the case.") (citation omitted). The Court's remaining discussion of the merits is based solely on White's claims.

**B.    Plaintiff's constitutional claims fail for lack of state action.**

*1.    Federal Constitutional Claims*

Deutsche Bank argues that Plaintiff White's claims that the DTA violates due process, equal protection, and the takings clause of the U.S. Constitution fail for lack of state action. Dkt. 97 at 2. Plaintiff does not directly address the issue of state action for the federal constitutional claims in his briefs. *See* Dkt. 75, 76, 87, 88, 98, 99. But he does assert that Plaintiffs "raise a substantial constitutional inquiry into whether statutory trustees, paid by DB, can lawfully exercise judicial power delegated by the State of Washington to them as Washington State judicial officers without violating [] this Nation's organic law, those principles of Natural Justice upon which that organic law is based, international law, and long established equitable principles." Dkt. 76 at 27. A plain reading of this constitutional challenge shows that

Plaintiff presumes that Deutsche Bank is "exercis[ing] judicial power delegated by the State of Washington to them" when it conducts a nonjudicial sale of properties. *See id.*

This presumption of state action has been expressly rejected by the Supreme Court in *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 161–64 (1978) and the Ninth Circuit in *Apao v. Bank of New York*, 324 F.3d 1091, 1092 (9th Cir. 2003). In *Flagg Brothers*, the Supreme Court held that when a creditor enforced a lien through a private, non-judicial sale, there was no state action even when this procedure was authorized by the state's Uniform Commercial Code. 436 U.S. at 151–53. The Supreme Court rejected the plaintiff's arguments that the state's grant of a private power of sale was a delegation of a traditional government function or that it constituted state encouragement of nonjudicial remedies. *Id.* at 161, 164. Because the statute neither encourages nor compels the sale of the debtor's property, but merely recognizes its legal effect, the Supreme Court held that the sale did not implicate Fourteenth Amendment due process and equal protection protections. *Id.* at 153, 160, 166.

Several circuit courts, including the Ninth Circuit, have since explained that "self-help foreclosure remedies have existed since early in the common law, and thus one cannot say that the power of foreclosure is one traditionally belonging only to the government." *Apao*, 324 F.3d at 1094 (citing cases). And when nonjudicial foreclosure statutes were challenged on Fourteenth Amendment grounds, the Ninth Circuit (along with six other circuits) held "there was no state action in either the availability of such private remedies or their enforcement." *Id.* (citing cases).

For example, in *Apao,* the Ninth Circuit addressed whether Hawaii's nonjudicial foreclosure statute violated the due process clause of the Fourteenth Amendment. *Id.* at 1092. There, the plaintiff had obtained a mortgage on her residence but stopped making payments after three years. *Id.* at 1093. When the default was not cured within thirty days as required by the

1   mortgage contract, the lender instituted a nonjudicial foreclosure under Haw. Rev. Stat. § 667–5,

2   which the borrower challenged as unconstitutional. *Id.*

3          The Ninth Circuit affirmed the district court's dismissal of the case because "the sale was

4   a purely private remedy and involved no state action." *Id.* It also noted that "there has been no

5   legal or historical development in the intervening years that would require . . . us to reconsider

6   the round of decisions by this circuit and others a generation ago that upheld the constitutionality

7   of similar statutorily authorized sale procedures." *Id.*; *see Charmicor, Inc. v. Deaner*, 572 F.2d

8   694, 696 (9th Cir. 1978) (finding no state action in an equal protection challenge to Nevada's

9   nonjudicial foreclosure statute). The Ninth Circuit began its discussion with the text of the

10  Fourteenth Amendment, noting that it "shields citizens from unlawful governmental actions, but

11  does not affect conduct by private entities." *Apao*, 324 F.3d at 1093. Citing *Flagg Bros., Inc. v.

12  Brooks*, the Ninth Circuit reiterated the Supreme Court's holding that when a lien is enforced

13  "through a purely private, non-judicial sale," there is no state action "even though the lien was

14  authorized by the state's legislative enactment of the Uniform Commercial Code." *Id.* at 1094.

15         The Ninth Circuit further rejected the plaintiff's argument that because the residential

16  mortgage business is regulated by state and federal laws, any action by the mortgage lender is

17  converted into state action. *Id.* at 1095. It explained that "the development of the extensively

18  regulated secondary mortgage market does not convert the private foreclosure procedures at

19  issue here into state action" and while "the bar for state action is low . . . non-judicial foreclosure

20  procedures like Hawaii's nevertheless slip under it for want of direct state involvement." *Id.*

21         Like Hawaii's nonjudicial foreclosure statute, Washington's DTA neither "encourages"

22  nor "compels" the use of nonjudicial foreclosure procedures, but "merely recognizes its legal

23  effect." *See Apao*, 324 F.3d at 1094; *see also* RCW 61.24.030 (prerequisites that must be

24  complied with prior to a nonjudicial foreclosure); *Owen v. Atkins*, No. C15-5375 BHS, 2015 WL

5826313, at *2 (W.D. Wash. Oct. 6, 2015) ("[T]he contracted right to conduct a nonjudicial foreclosure does not convert [the trustee's] conduct into action under color of law."); *De Botton v. Quality Loan Servs. Corp. of Washington*, No. 2:23-CV-00223-RSL, 2023 WL 6126769, at *1 (W.D. Wash. Sept. 19, 2023) (challenge to the DTA "cannot support a takings claim under either the federal or state constitution because there was no governmental action").

Under Supreme Court and Ninth Circuit precedent, Defendants' use of the DTA cannot be considered state action. *See Flagg Bros., Inc.*, 436 U.S. at 161–64; *Charmicor, Inc.*, 572 F.2d at 696; *Apao*, 324 F.3d at 1094. The "United States Constitution protects individual rights only from *government* action, not from *private* action." *Single Moms, Inc. v. Montana Power Co.*, 331 F.3d 743, 746 (9th Cir. 2003). Thus, Deutsche Bank's motion for summary judgment on the federal constitutional claims is GRANTED.

### 2.   State Constitutional Claims

Plaintiff's claim that the DTA violates Article IV, section 6 of the Washington Constitution has also been repeatedly rejected by state courts. *See Kennebec, Inc. v. Bank of the W.*, 88 Wn.2d 718, 725, 565 P.2d 812 (1977); *Jackson v. Quality Loan Serv. Corp.*, 186 Wn. App. 838, 846, 347 P.3d 487 (2015); *Larson v. Snohomish Cnty.*, 20 Wn. App. 2d 243, 281, 499 P.3d 957 (2021).

For example, in *Kennebec*, the Washington Supreme Court held that the DTA, RCW 61.24, is "passive state involvement and does not constitute significant 'state action' and, therefore, it is neither violative of the due process clause of the Fourteenth Amendment nor of article 1, section 3 of the Washington State Constitution." 88 Wn.2d at 726. The court explained that parties have the power to choose to use the DTA or not. *Id.* at 725. "If the parties elect to contract and use the deed of trust device, the statute regulates its manner of operation almost solely for the protection of the debtor." *Id.* at 725. "The creditor may, if he chooses, elect to

1  involve the state by utilizing judicial foreclosure and thereby preserving any deficiency that may

2  exist. . . . [but] if he opts to foreclose nonjudicially, he does not involve the state, . . . [and] is

3  restricted to the value of his security." *Id.* Since RCW 61.24 "neither commands nor forbids

4  nonjudicial foreclosure[,]" the Washington Supreme Court found no state action and upheld the

5  constitutionality of the statute. *Id.*

6      The Washington Court of Appeals in *Jackson* again addressed state constitutional

7  challenges to the DTA. 186 Wn. App. at 846–49. There, the plaintiff argued that Article IV,

8  section 6 of the Washington State Constitution provides that "[t]he superior court shall have

9  original jurisdiction in all cases at law which involve the title or possession of real property." *Id.*

10  at 847 (citing Wash. Const. art. IV, § 6). But because the DTA vests power in the trustee to sell

11  property through a nonjudicial foreclosure proceeding, the plaintiff contended that the DTA

12  impermissibly divested the superior court of jurisdiction. *Id.*

13      Noting that several federal courts[2] had previously rejected this argument, the court

14  explained that the DTA does not take away jurisdiction from superior courts because "a

15  nonjudicial foreclosure is not made pursuant to a judgment but rather is one conducted under a

16  power contained in a mortgage or a decree of foreclosure." *Id.* at 847, 848 n.9. Since the option

17  of a nonjudicial foreclosure is created "through an agreement between the grantor and the

18  beneficiary of the deed of trust[,]" the "DTA does not divest the superior court of jurisdiction."

19  *Id.* at 847. In fact, the court noted that the DTA preserves the superior court's constitutional grant

20

21  [2] *See Knecht v. Fid. Nat'l Title Ins. Co.*, No. C12–1575RAJ, 2014 WL 4057148 * 11 (W.D.
    Wash. Aug. 14, 2014) (rejecting the plaintiff's argument that DTA's "decision to vest

22  discretionary authority in a trustee" violates Washington Constitution Art. IV, § 6 because the
    plaintiff "advances no 'interpretation' of the words of any portion of the Act that would prohibit

23  nonjudicial foreclosures, and the court cannot conceive of one"); *Galyean v. Nw. Tr. Servs., Inc.*,
    No. C13–1359 MJP, 2014 WL 3360241 *6 (W.D .Wash. July 9, 2014) ("The Deed of Trust Act

24  has already been found by the Washington State Supreme Court to satisfy constitutional due
    process requirements.").

ORDER GRANTING DEUTSCHE BANK'S MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 25

of jurisdiction in specific provisions of the statute. *Id.*; *see id.* at n.8 ("RCW 61.24.130(1) (buyer has right to file action in superior court to restrain a trustee's sale); RCW 61.24.130(8)(j) (granting borrower power to initiate court action); RCW 61.24.040(2); RCW 61.24.090(2) (granting borrower right to request any court to determine reasonableness of fees)"). For these reasons, the court concluded that the "legislature had authority to enact the DTA, and its enactment did not encroach upon the jurisdiction of the superior court." *Id.* at 849.

Plaintiff's challenges under Article I, section 10, and Article V, section 6 of the Washington Constitution also lack merit. *See* Dkt. 8 ¶¶ 3.99(I), 4.6. Article I, section 10 provides that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." Plaintiff does not provide any argument in support of this claim in his briefs. *See* Dkt. 76, 87, 98, 99; *see Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e will not consider any claims that were not actually argued in [the party's] opening brief.") (citation omitted). Finally, Plaintiff asserts a claim under Article V, section 6, *see* Dkt. 8 ¶ 4.6, but Article V contains only three sections, *see* Wash. Const. art. V. Again, the Court declines to consider this claim as it will "review only issues which are argued specifically and distinctly in a party's . . . brief." *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) (citation omitted).

Accordingly, Deutsche Bank's motion for summary judgment on the state constitutional claims is GRANTED.

## C. Plaintiff's DTA, CPA, and breach of contract claims fail because he cannot show that the Trusts do not possess the original promissory notes.

Deutsche Bank argues that the Plaintiffs' "only factual allegations relate to their lost note theory," which is "the basis for Plaintiffs' bare assertions that Defendants violated the DTA and . . . CPA." Dkt. 97 at 8, n.1. Deutsche Bank argues that it has produced evidence showing

that "the Trust held the original notes entitling them to complete the January 5, 2024 Trustee Sales, and that the 2006-5 Trust holds the original notes for the remaining three loans and is entitled to proceed with non-judicial foreclosures." Dkt. 67 at 8 (citing Dkt. 69; Dkt. 70).

Specifically, Deutsche Bank asserts that SPS's business records show how each original promissory note came into their possession and is currently held at their counsel's office. *Id.*; *see* Dkts. 70-5, 70-11, 70-18, 70-23, 70-28. Additionally, Deutsche Bank provided the testimony of Hannah McFarland[3], an expert in document examination and handwriting analysis. Dkt. 69, 69-1, 69-3. McFarland has been certified by the National Association of Document Examiners ("NADE") since 2002 and currently serves as Secretary for the Executive Board of Directors of NADE. Dkt. 69-1 at 2.

McFarland examined the five promissory notes held at the Trusts' counsel's office in Seattle, Washington. Dkt 69 ¶ 4. She was provided with "28 exemplar initials of Alvin B. White on copy documents dated 9-10-2005 to 3-29-2006" and "10 original initials of Alvin B [that were] produced for the purpose of handwriting comparison." Dkt. 69-3 ¶ 4. Based on her comparison of the questioned and exemplar initials of White produced by his counsel, McFarland identified several similarities. *Id.* ¶ 7. For example, she noted "[q]uestioned and exemplar initials are roughly one quarter inch tall;" "[p]lacement of the questioned and exemplar initials are roughly one quarter inch tall;" "[m]any ending strokes are average in length in the questioned and exemplar initials;" and "[t]here is very little variation in pressure in that the upstrokes and downstrokes have the same pressure[.]" *Id.* Having "found no significant

---

[3] Plaintiff did not seek to exclude the expert testimony of Hannah McFarland. Rather, after the Court gave Plaintiff the opportunity to submit supplemental briefing explaining his contention that McFarland was unreliable, Plaintiff disavowed ever attempting to exclude McFarland. *See* Dkt. 92 at 3 ("The record shows (and this Court should know this) that Plaintiffs have not moved to exclude Defendants' expert; rather Plaintiffs rely on Defendants' expert witness graphology-trained handwriting expert, McFarland, to support their theory of the case.").

differences between the questioned and exemplar initials of Alvin B. White[,]" McFarland opined that the "combination of all similarities between the questioned and exemplar initials provides convincing evidence that the questioned initials are genuine initials of Alvin B. White." *Id.* ¶¶ 8–9.

Deutsche Bank contends that it is entitled to judgment as a matter of law for the DTA and CPA claims because Plaintiff fails to make a sufficient showing on an essential element of his claim—that the Trusts do not hold the original promissory notes. Dkt. 97 at 8. Deutsche Bank also argues that it has met its initial burden to come forward with evidence, through SPS's document records and its handwriting expert, showing that it possesses the original notes, but Plaintiff has "submitted no admissible or corroborating evidence." *Id.* Since Plaintiff has failed to satisfy an essential element of his claims against Defendants, Deutsche Bank argues that summary judgment should be granted in its favor. Dkt. 67 at 9.

Plaintiff contends that his "theory of the case is that Deutsche Bank and its agents are attempting to enforce facially invalid and fraudulent documents—specifically, a promissory note and deed of trust that are not original, wet-ink signed instruments, but digital reproductions that cannot confer lawful enforcement rights under Washington law, the Constitution, or long-standing equitable doctrines." Dkt. 98 at 9. Plaintiff alleges that Defendants' "attempt[] to foreclose on a void note" violates the borrower's right to restrain a trustee's sale under the DTA, RCW 60.24.130(1). Dkt. 8 ¶ 4.11. Plaintiff also asserts that Defendants' "attempt[] to collect a loan that does not exist" or "attempt to collect monies which are not owed to them" constitutes unfair, deceptive, or illegal practices under the CPA. *Id.* ¶ 4.14. Finally, Plaintiff alleges that enforcement of a void note violated the terms of his loan contract. *Id.* ¶ 4.11.

As evidence that Defendants do not possess the original notes, Plaintiff first presents Dr. Kelley's "forensic findings establish[ing] that the five promissory notes at issue, which were

purportedly executed in 2006, were not signed by Alvin White but mechanically reproduced, i.e. forged using inkjet printing technology." Dkt. 98 at 9. Plaintiff next provides William Paatalo's testimony that "the endorsements DB relies upon to prove it is a 'holder' of the note were most likely fabricated after the fact and are not the result of a lawful negotiation." Dkt. 76 at 23. Plaintiff also offers historical evidence, *see* Dkt. 77 ¶ 36, showing that "promissory notes were routinely destroyed as part of the money changers' business practices during the lead up to the subprime mortgage crisis." Dkt. 76 at 12.

For example, Plaintiff asserts that in 2016, Deutsche Bank, acting as trustee for mortgage-backed securities trusts, entered into a $3 billion settlement agreement with the Federal Deposit Insurance Corporation ("FDIC") and JPMorgan Chase. *Id.* Plaintiff contends that in this settlement, Deutsche Bank "released all claims relating to defective, incomplete, or non-existent documentation," which "included those in the relevant 2006 defendant trusts in this case[.]" *Id.* at 12–13 (citing Dkt. 81-12 at 7). Plaintiff also offers a memorandum from Deutsche Bank dated July 28, 2008, where Deutsche Bank acknowledged "that the number of contested foreclosure proceedings" has "substantially increased" nationwide and that "some courts are demanding that the party seeking to foreclose prove 'ownership[.]'" Dkt. 77-6 at 3–4.

Plaintiff points to another memorandum from Deutsche Bank that was sent to securitization loan servicers stating that "[r]ecent media reports suggest the Alleged Foreclosure Deficiencies may include the execution and filing by certain Servicers and/or their agents of potentially defective documents . . . in connection with certain foreclosure proceedings." Dkt. 77-7 at 3. Plaintiff argues that these "internal documents make one thing abundantly clear: ***DB knew that document fabrication, loss, and improper filings were endemic in the securitization and foreclosure process.***" Dkt. 76 at 15 (emphasis in original). Plaintiff references several other public documents that he argues should be judicially noticed under Federal Rule

201 to show that "promissory notes were routinely destroyed." *See id.* at 14–19. Based on this historical evidence, Plaintiff contends that "the industry had institutionalized note destruction as part of its standard procedures" and "DB and the trusts have no equitable or legal basis to now claim authority to enforce instruments it has already deemed defective or unenforceable." *Id.* at 18, 13.

The Court agrees that Defendants' authority to foreclose on White's properties depends on their status as "holders" of the promissory notes. *Bain v. Metro. Mortg. Grp., Inc.,* 175 Wn.2d 83, 89 285 P.3d 34 (2012) ("[O]nly the actual holder of the promissory note or other instrument evidencing the obligation may be a beneficiary with the power to appoint a trustee to proceed with a nonjudicial foreclosure on real property" under the DTA.); *see also id.* at 104 ("[A] beneficiary must either actually possess the promissory note or be the payee."). But Plaintiff has not carried his burden to show evidence from which a reasonable factfinder could conclude that the Trusts do not possess the promissory notes. *See* Fed. R Civ. P. 56(c). He thus has failed to raise a triable issue on his DTA, CPA, and breach of contract claims. *See In re Brazier Forest Prods., Inc.,* 921 F.2d 221, 223 (9th Cir. 1990) ("[I]f the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden. The moving party may simply point to the absence of evidence to support the nonmoving party's case. The nonmoving party must then make a sufficient showing to establish the existence of all elements essential to their case on which they will bear the burden of proof at trial.").

First, the Court has excluded Dr. Kelley's opinions that the promissory notes were fabricated because Plaintiff has not established by a preponderance of evidence that Dr. Kelley is a qualified expert in forensic science or that his testimony is reliable. Dkt. 104 at 10–16. Second, the Court similarly found William Paatalo unqualified to opine on the authenticity of the

promissory notes because he lacked the "knowledge, skill, experience, training, or education" in a relevant discipline. *Id.* at 16–20; Fed. R. Evid. 702. Thus, the remaining evidence Plaintiff has provided are public records that he requests be judicially noticed, the entire 2006 Revised Code of Washington, court filings from other cases, and documents supporting Plaintiff's counsel's defense to a disciplinary investigation by the Washington State Bar. *See* Dkt. 76 at 14–19; Dkt. 77-2; Dkt. 80-9; Dkt. 77-15; Dkt. 77-16.

Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could not find that the Trusts do not possess the promissory notes. At best, some of the records relate to systemic problems in the mortgage system. *See, e.g.*, Dkt. 77-5 (Deutsche Bank memorandum informing servicers of best practices in foreclose and eviction proceedings); Dkt. 77-6 (Deutsche Bank memorandum asking servicers to be mindful of issues including proving ownership of loans); Dkt. 77-7 (Deutsche Bank memorandum expressing concern to servicers about the execution and filing of "potentially defective documents"). But none offer evidence that the five promissory notes at issue *in this case* was fabricated. *See Bavand v. OneWest Bank, FSB*, 587 F. App'x 392, 394 (9th Cir. 2014) ("Bavand argues that OneWest's possession of the note is a fact in dispute, but she fails to produce any evidence to support her claim or to contest OneWest's representative Charles Boyle's affidavit, declaring that OneWest currently possesses the original note and deed of trust.").

Because Plaintiff does not point to any evidence from which a reasonable factfinder could conclude that the Trusts do not possess the promissory notes, Deutsche Bank's motion for summary judgment on the DTA, CPA, and breach of contract claims is GRANTED.

**D.   Plaintiff is not entitled to equitable relief or a declaratory judgment.**

Plaintiff White seeks to restrain Defendants from proceeding with a nonjudicial sale of his remaining properties. Dkt. 8 ¶¶ 3.29, 3.30. A plaintiff seeking a permanent injunction must

show: "(1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction." *Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 989 (9th Cir. 2020) (citation omitted). Here, Plaintiff has not succeeded on the merits. Accordingly, he is not entitled to an order restraining Defendants from conducting a nonjudicial sale of property under the DTA, RCW 61.24.130.

Plaintiff also requests a declaration as to the meaning of the current version of RCW 34.24.130 and whether the 2006 version of RCW 61.24.130 is the governing law. Dkt. 8 ¶¶ 4.1, 4.2. Plaintiff argues that "[n]either of the statutes DB and its paid-for trustees rely on as the basis for their MSJ was in existence in 2006. . . . [and] [t]o the extent those changes in these statutes affect the outcome of this case, Plaintiffs object they violate the Contracts Clause." Dkt. 76 at 29. Plaintiff also contends that even if the Court applies the most recent version of RCW 61.24.130, it does not establish Deutsche Bank's standing to foreclose. *Id.* at 29–30. In any case, Plaintiff argues that RCW 61.24.130 is preempted by the Fourteen Amendment's protections against taking of property. *Id.* at 30.

Deutsche Bank argues that the claims for declaratory judgment should be denied because "Plaintiffs argue that the amendments to RCW 61.24.130 unconstitutionally altered Mr. White's contracts but fail to identify how the present matter would be different under the 2006 version[.]" Dkt. 97 at 6. Deutsche Bank further asserts that the law was amended twice since 2006—once in 2008 and once in 2018. *Id.* at 7. Since Plaintiff provides no basis for why the amended version is unconstitutional, Deutsche Bank maintains that the request should be denied. *Id.* Deutsche Bank also argues that Plaintiff's request for a declaration regarding the constitutionality of RCW 61.24.130 is moot because there is no substantial controversy between parties "of

1    sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id*. Finally,

2    Deutsche Bank argues that Plaintiff's request for a declaration that the Trustee's sale violated the

3    Deed of Trust Act is not an appropriate exercise of federal jurisdiction because the sale occurred

4    over 1.5 years ago and there is no alleged "continuing or future violations." *Id.* [4]

5         "The Declaratory Judgment Act creates only a remedy, not a cause of action." *Bisson v.*

6    *Bank of Am., N.A.*, 919 F. Supp. 2d 1130, 1139 (W.D. Wash. 2013). Thus, a "court cannot grant

7    declaratory relief in the absence of a substantive cause of action." *Id.* (citation omitted); *see*

8    *United States v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985) ("Declaratory relief should

9    be denied when it will neither serve a useful purpose in clarifying and settling the legal relations

10   in issue nor terminate the proceedings and afford relief from the uncertainty and controversy

11   faced by the parties.") (citing cases). Plaintiff has not raised a genuine factual dispute about the

12   authenticity of the promissory notes, nor have any other claims survived the summary judgment

13   stage. *See, supra* Sec. IV.A–C; *Umouyo v. Bank of Am., NA*, No. 2:22-CV-00704-JHC, 2023 WL

14   1433804, at *3 (W.D. Wash. Feb. 1, 2023) (denying the request for declaratory relief because the

15   plaintiffs did not demonstrate a substantive legal basis for the Court to void the promissory note,

16   deed of trust, or any other legal claim the defendant had in the property).

17

18

---

19   [4] While "a declaratory judgment merely adjudicating past violations of federal law—as opposed
20   to continuing or future violations of federal law—is not an appropriate exercise of federal
     jurisdiction[,]" the "cessation of conduct does not necessarily render a declaratory judgment
     moot." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 868 (9th Cir. 2017); *Biodiversity*
21   *Legal Found. v. Badgley*, 309 F.3d 1166, 1175 (9th Cir. 2002); *see also Skysign Int'l, Inc. v. City*
     *& Cnty. of Honolulu*, 276 F.3d 1109, 1115 (9th Cir. 2002) ("Although the district court correctly
22   noted that the assessed fines are for [the plaintiff's] 'past conduct,' that distinction does not in
     and of itself deprive a federal court of jurisdiction to hear a declaratory judgment action
23   challenging the enforceability of the law under which the penalty is assessed."). Regardless, the
     Court does not reach this issue because Plaintiff has not established a substantive cause of action
24   that would entitle him to declaratory relief.

ORDER GRANTING DEUTSCHE BANK'S MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 33

Because Plaintiff cannot maintain a substantive cause of action that would warrant declaratory relief, Deutsche Bank's motion for summary judgment on these claims is GRANTED.

## V.    CONCLUSION

Therefore, it is hereby ORDERED that:

- Deutsche Bank's motion for summary judgment (Dkt. 67) is GRANTED.

- Plaintiff White's claims are DISMISSED with prejudice and Plaintiff Church of the Gardens' claims are DISMISSED without prejudice for lack of subject matter jurisdiction.

- Plaintiffs' motion for summary judgment is DENIED (Dkt. 76) as moot.

Dated this 2nd day of September, 2025.

Tiffany M. Cartwright
United States District Judge